**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHERYL RUTH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 14 C 191** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Cheryl Ruth seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416, 423(d), 1381a. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and have now filed cross-motions for summary judgment. After careful review of the record, the Court grants Plaintiff's motion, denies Defendant's motion, and remands the case for further proceedings.

## PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on March 15, 2011, alleging in both applications that she became disabled on December 31, 2009 due to osteoporosis, degeneration and arthritis of the spine, depression and high cholesterol. (R. 107, 114, 144). The Social Security Administration denied the applications initially on June 10, 2011, and again upon reconsideration on August 19, 2011. (R. 60-76). Plaintiff filed a timely request for hearing and appeared before Administrative Law Judge Carla Suffi (the

"ALJ") on August 20, 2012.  (R. 28).  The ALJ heard testimony from Plaintiff, who was represented by counsel, as well as from vocational expert Jeffery W. Lucas (the "VE"). Shortly thereafter, on September 13, 2012, the ALJ found that Plaintiff is not disabled because she can perform her past work as a cashier.  (R. 11-21).  The Appeals Council denied Plaintiff's request for review, (R. 1-3), and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

In support of her request for remand, Plaintiff argues that the ALJ (1) made an improper credibility determination; (2) erred in weighing the opinion evidence of record, resulting in a flawed residual functional capacity ("RFC") assessment; and (3) posed an incomplete hypothetical question to the VE.  As discussed below, the Court agrees that the ALJ's decision is not supported by substantial evidence and the case must be remanded for further consideration.

## FACTUAL BACKGROUND

Plaintiff was born on February 9, 1956, and was 56 years old at the time of the ALJ's decision.  (R. 107, 114).  She has an 11th grade education and has been working as a cashier at Wal-Mart since 2009.  (R. 31, 33).  She initially worked 36 hours per week but at some point had to reduce her schedule to four and a half hours a day, four days per week due to pain.  (R. 32, 34).  Plaintiff's job duties include scanning items and putting them in bags, and require her to stand throughout her shift with one 15-minute break.  (R. 33).  She says she is unable to work full-time because "[e]very single bone in every part of my body hurts so bad," and she has a hard time thinking and focusing due to constant pain.  (R. 36-37).

**A.    Medical History**

**1.    2008**

The first available medical record is from June 5, 2008, when Plaintiff started seeing Juan C. Santiago-Palma, M.D. ("Dr. Santiago") of Oak Orthopedics for pain in the lower back with "radicular type symptoms" along the legs.  (R. 210).  The pain had reportedly started on January 2, 2007 and was at a level of 8/10, though Plaintiff denied experiencing any weakness or numbness in her legs.  (*Id*.).  An x-ray of the lumbosacral spine taken that day showed degenerative changes along the lower back, and a straight leg raise test "[r]eproduce[d] symptoms in the lower back on the right."  (R. 210-11).  On examination, Plaintiff exhibited tenderness to palpation along the bilateral lower lumbar spine, as well as limited flexion and extension.  (R. 211).  The rest of Plaintiff's exam was normal, with full muscle strength of 5/5 in her arms and legs, normal sensation, and negative Babinski, Patrick and Gaenslen's tests.[1]  Dr. Santiago diagnosed lower back pain and sciatica, and ordered an MRI of the lumbosacral spine.  (*Id*.).

Plaintiff had the MRI four days later, on June 9, 2008, and it showed multilevel degenerative changes; grade 1 spondylolisthesis (disc slippage) at L4-L5; and moderate bilateral neuroforaminal stenosis at L5-S1.  (R. 212).  During a follow-up appointment on June 13, 2008, Dr. Santiago reviewed the MRI results with Plaintiff and scheduled her for epidural steroid injections at the L5 level, which she had on June 18, 2008.  (R. 212, 213, 238-39).

---

[1]    A Babinski test is used to identify upper motor neuron disease.  (medical-dictionary.thefreedictionary.com/Babinski+test).  The Patrick and Gaenslen's tests both test for pain or dysfunction in the hip and sacroiliac joints.  (medical-dictionary.thefreedictionary.com/Patrick+test).

When Plaintiff returned to Dr. Santiago on July 3, 2008, she reported partial relief from the injections, with her pain level reduced to 4/10 in the lower back and legs. She newly complained of an aching sensation in the cervical spine radiating to the shoulders, however, and an x-ray performed that day revealed degenerative changes at C5-C6. (R. 214). On examination, Plaintiff had limited flexion and extension in both the cervical and lumbar spine, as well as tenderness to palpation along the bilateral cervical spine. All other tests were normal, including no weakness or numbness in the legs or arms; full muscle strength of 5/5 in all extremities; normal sensation; negative straight leg raise, Patrick and Gaenslen's tests; and negative Spurling and Hawkins tests, which check for impingement in the neck and shoulder. (*Id*.). Dr. Santiago diagnosed lumbar degenerative disease, sciatica and cervicalgia (neck pain), scheduled a second round of epidural steroid injections, and prescribed hydrocodone for pain. (R. 215).

Six days later, on July 9, 2008, Plaintiff had the bilateral steroid injections at L5. (R. 235-37). An MRI of the lumber spine taken the same day showed "[m]ultilevel degenerative change, most significant at L5-S1, where there is foraminal stenosis. Lesser changes at other levels," as well as "lateral disc herniation with displacement of the left L4 dorsal root ganglion." (R. 231). Once again, Plaintiff achieved only partial relief from the injections, telling Dr. Santiago on July 31, 2008 that her pain was a 6/10 in the cervical spine and 4/10 in the lumbar spine. She still had full muscle strength of 5/5 in her arms and legs with normal sensation, and Dr. Santiago did not change his previous diagnosis. (R. 216). He scheduled Plaintiff for a third series of injections at L5-S1 and an MRI of the cervical spine, and instructed her to continue taking hydrocodone as needed. (R. 217).

The August 21, 2008 MRI was somewhat limited due to "motion artifacts," but did show cervical spondylosis, mainly at C5-C6 and C6-C7; mild central canal narrowing at C5-C6; and narrowing of multiple bilateral neural foramina.  (R. 228).  Plaintiff's August 28, 2008 follow-up with Dr. Santiago was unchanged, with limited flexion and extension of the lumbar spine; and tenderness to palpation in the lower lumbar spine; but full strength of 5/5 in all extremities; normal sensation; and negative straight leg raise, Babinski, Gaenslen's, and Patrick tests.  (R. 218).  Dr. Santiago scheduled a repeat MRI of the cervical spine, and continued to recommend a third set of steroid injections at L5-S1.  (R. 219).

Plaintiff received the injections on September 19, 2008, and at a follow-up visit with Dr. Santiago on October 6, 2008, she reported that her symptoms in the lower back had "significantly improved" with her pain down to a level of 3/10.  Examination results remained normal, though Plaintiff still complained of pain along the cervical spine.  (R. 220).  Dr. Santiago recommended physical therapy pending Plaintiff's upcoming MRI.[2] (R. 221).  That October 17, 2008 test showed degenerative disease at C5-C6 and C6-C7, with annular bulging causing moderate to marked neuroforaminal narrowing at C5-C6 and moderate left neuroforaminal narrowing at C6-C7.  (R. 226).

When Plaintiff returned to Dr. Santiago for a follow-up on October 21, 2008, she exhibited tenderness to palpation along the cervical spine, and extension and lateral rotation of the cervical spine reproduced her pain symptoms.  Other tests were normal, including full strength of 5/5 in all extremities and a negative Spurling test.  (R. 222).  Dr. Santiago added cervical degenerative disease to Plaintiff's list of diagnoses and

---

[2]      Plaintiff testified that she never pursued physical therapy.  (R. 40).

scheduled her for steroid injections at levels C2-C3, C3-C4, C4-C5 and C5-C6, which she had on November 12, 2008.  (R. 222-23, 232-34).

At a follow-up appointment on December 16, 2008, Plaintiff told Dr. Santiago that she experienced good but temporary relief of lower back pain from the injections, rating her pain at a level 7/10 in the lower back and 5/10 in the cervical spine.  She continued to complain of radicular type symptoms in both legs and exhibited limited flexion and extension with right and left lateral rotation of the cervical and lumbosacral spine, as well as associated tenderness to palpation.  Her strength was normal, however, with no weakness or numbness in the arms.  (R. 224).  Dr. Santiago referred Plaintiff to Juan Jimenez, M.D., for a neurosurgical evaluation, and instructed her to continue taking hydrocodone as needed up to 4 per day.[3]  (R. 225).

### 2.    2009 through 2010

On February 5, 2009, Plaintiff started seeing internist Jordan A. Goodman, M.D., for back and neck pain, and also complained of feeling depressed and withdrawn.  (R. 260).   Dr. Goodman recorded normal findings based on his physical exam, and diagnosed osteopenia, lumbar degenerative disc disease, and dysthymia (depression). He prescribed Celexa for the depression, Vicodin for the pain, and Boniva for the osteopenia.  (R. 261).  At Plaintiff's next appointment with Dr. Goodman on June 25, 2009, she reported daily headaches, body aches, lack of energy, and hand and joint pain and stiffness.  (R. 258).  Dr. Goodman diagnosed osteoarthritis of the hands and

---

[3]    Plaintiff testified at the hearing that she was unable to consult with the neurosurgeon because she lost her insurance.  (R. 39).  Six weeks later, however, she was able to start treating with a new internist.

back, prescribed Norco for pain, and told Plaintiff to stay off work for one week.  (R. 259).

Plaintiff saw Dr. Goodman four more times between July 2009 and December 2010.  The November 4, 2009 visit focused on Plaintiff's concerns about her bone density, (R. 255), and a November 13, 2009 bone densitometry showed osteoporosis of the neck but "no significant change since 2007."[4]  (R. 279).  Plaintiff complained of headaches, body aches and fatigue at the March 2, 2010 appointment, but a physical exam produced normal results.  (R. 253).  Dr. Goodman diagnosed fatigue, dysthymia (depression), and osteoarthritis, and prescribed Norco for pain and Zoloft for depression.  (R. 254).  Plaintiff continued to complain of headaches, "bony aches" and cervical neck pain at a visit on July 12, 2010, (R. 251), but her physical exam was normal except for tenderness and decreased range of motion in the neck.  Dr. Goodman diagnosed cervical degenerative disc disease and ordered an x-ray of the cervical spine, which Plaintiff had on July 21, 2010.  (R. 252).  The test showed mild bony demineralization and "significant degenerative disc and bony changes primarily extending from C5 through C7 levels."  (R. 269).

Dr. Goodman again confirmed normal physical and mental findings during a November 4, 2010 exam, though Plaintiff complained of constant headaches and occasional, severe dizziness.  (R. 249-50).  A CT scan of the brain dated November 10, 2010 was normal, (R. 264), and a Doppler study of the neck conducted the same day showed only a mild amount of calcific atherosclerotic change that was not causing significant stenosis.  (R. 265-66).

---

[4]     The record does not contain the results of the 2007 bone scan.

### 3.    2011

Plaintiff returned to Dr. Goodman on February 17, 2011 with complaints of sinus pressure. (R. 247). Aside from a congested nose, her physical exam was normal, as was her mental status. (R. 247-48). The following month, on March 15, 2011, Plaintiff applied for disability benefits. In April 2011, Plaintiff started seeing David C. Lee, M.D., about her headaches and sinus problems, and ultimately underwent nasal surgery. (R. 350-51, 377). During a post-op exam on April 28, 2011, she reported continued headaches. (R. 350).

On May 9, 2011, Jovita Anyanwu, M.D., performed a Medical Evaluation of Plaintiff at the request of the Bureau of Disability Determination Services ("DDS"). (R. 291-94). Dr. Anyanwu found Plaintiff to have limited range of motion in the cervical, thoracic and lumbar spine, as well as reduced flexion of the cervical and lumbar spine. There was no tenderness in the spinal regions, however, and Plaintiff had full range of motion and full strength of 5/5 in all major muscle groups except the spine, which was at a level of 4/5. Plaintiff's grip strength was normal at 5/5 in both hands, as was her ability to perform fine finger manipulation, open a jar, zip/unzip, and button/unbutton. (R. 292-93). She exhibited no sensory loss, a steady gait, and an ability to walk 50 feet unassisted; she had no problem standing from a sitting position; and she could stoop, squat, walk heel to toe, and get on and off the exam table without difficulty. (R. 293). Dr. Anyanwu characterized Plaintiff's mood as stable, with appropriate insight and judgment, and noted that she is able to drive, bathe, feed, and dress herself without assistance. Plaintiff reported her pain at that time as a level of 1/10. (*Id.*).

On May 25, 2011, Henry Rohs, M.D., completed a Physical Residual Functional Capacity ("RFC") Assessment of Plaintiff for DDS. (R. 299-306). Dr. Rohs stated that she can occasionally lift 20 pounds; frequently lift 10 pounds; sit, stand and walk for 6 hours in an 8-hour workday; and push and pull without limitation. (R. 300). Plaintiff can also occasionally crawl and climb ladders, ropes, and scaffolds, (R. 301), and she must avoid concentrated exposure to hazards. (R. 303). Otherwise, Plaintiff has no additional physical restrictions. (R. 306).

Also on May 25, 2011, Erwin J. Baukus, M.D., performed a mental consultative examination of Plaintiff for DDS. (R. 309, 313). Plaintiff drove to the appointment alone, walked without assistance, and exhibited unremarkable balance, gait, and gross motor functioning, though she did have a tremor in both hands and complained of pain in her spine and neck. (R. 309-10, 311). With respect to her mental state, Plaintiff told Dr. Baukus that she experienced sleep disturbance; decreased energy; feelings of guilt and worthlessness; difficulty concentrating; psychomotor agitation; and pervasive loss of interest in most activities. (R. 310). She also described generalized persistent anxiety accompanied by motor tension, autonomic activity, vigilance and scanning, apprehensive expectation, recurrent severe panic attacks, and recurrent compulsions. (R. 311).

Despite these issues, Plaintiff never sought treatment with a psychiatrist, psychologist or other mental health professional. (R. 310). She reported independently caring for her activities of daily living; walking and driving around the neighborhood; doing light chores; and sometimes going to the grocery store with her daughter; and she also demonstrated appropriate social behavior during the exam. (R. 311). Dr. Baukus

observed a constricted but stable affect; depressed mood; fair relatedness; adequate abstract thinking; good judgment; and normal speech, though he documented evidence of psychomotor agitation in the form of hand wringing. (R. 311-12). He diagnosed panic disorder without agoraphobia, and chronic dysthymic disorder. (R. 313).

Approximately two weeks later, on June 7, 2011, Joseph Mehr, Ph.D., completed a Psychiatric Review Technique of Plaintiff for DDS. (R. 314-26). Dr. Mehr opined that Plaintiff has moderate restriction of activities of daily living; mild difficulties maintaining social functioning; and moderate difficulties maintaining concentration, persistence or pace. (R. 324). In a Mental RFC Assessment completed the same day, Dr. Mehr stated that Plaintiff is moderately limited in the ability to understand, remember and carry out detailed instructions, but otherwise has no significant limitations. (R. 328-29). She is independent in her activities of daily living to the extent allowed by her physical condition, and she has the mental capacity to "understand and remember instructions for simple work of a routine and repetitive type." (R. 330).

Plaintiff had another appointment with Dr. Goodman on June 27, 2011. Though she complained that her joints all ached, the primary purpose for that visit was sinusitis. (R. 375). Shortly thereafter, on August 9, 2011, Tyrone Hollerauer, Psy.D., affirmed Dr. Mehr's June 2011 mental RFC assessment. On August 17, 2011, Frank Jimenez, M.D., affirmed Dr. Rohs's May 2011 physical RFC assessment. (R. 334).

When Plaintiff next saw Dr. Goodman on October 24, 2011, she presented with numbness and tingling in both arms from the elbows to the fingertips. (R. 373). Dr. Goodman referred her to a hand surgeon, Kermit S. Muhammad, M.D. (R. 374). At an initial visit on November 1, 2011, Plaintiff told Dr. Muhammad that her hand pain was

waking her up at night. (R. 357).[5] The next day, on November 2, 2011, Plaintiff had a rheumatology consultation with John Sunil, M.D. (R. 336). The exam showed multiple tender spots all over the lumbosacral spine, and Plaintiff's hands had Heberden's nodes (bony bumps on the finger joint closest to the fingernail) and a positive Tinel's sign (a tingling sensation often present in carpal tunnel syndrome) on the right. (R. 337, 338). Dr. Sunil found no evidence of joint synovitis, tenderness or swelling in either hand, however, and Plaintiff exhibited good range of motion in both shoulders, no problems with her knees or ankles, and a normal gait. (*Id*.). Dr. Sunil assessed osteoporosis, osteoarthritis of multiple sites, arthralgias (joint pain) in multiple sites, lumbar disc degeneration, fibromyalgia, and depression, and noted that he believed Plaintiff's "main symptoms are from FMS [fibromyalgia syndrome] with underlying depression." He prescribed Cymbalta and started the process of weaning her off Zoloft. (R. 338).

On November 7, 2011, Plaintiff had an electrodiagnostic study ("EMG") that showed evidence of mild bilateral carpal tunnel syndrome, worse on the left side. (R. 352-54). She had a follow-up appointment with Dr. Muhammad on November 8, 2011, to review the test results, but once again, the second page of the report is missing so there is no information regarding the diagnosis or plan. (R. 356).

### 4. 2012

Plaintiff's last documented visit to Dr. Goodman was on January 23, 2012, when she asked him to fill out some disability forms. (R. 371). In one form, Dr. Goodman stated that Plaintiff can frequently lift and carry 10 pounds; stand, walk and sit for less

---

[5] For reasons unknown, the second page of Dr. Muhammad's November 1, 2011 treatment note is not part of the record so his diagnosis and plan is not known. As discussed *infra*, however, it appears he recommended an electrodiagnostic study of Plaintiff's hands.

than 2 hours a day; never climb ladders; occasionally push/pull with her hands and feet; and occasionally climb ramps and stairs, balance, stoop, kneel, crouch, crawl, reach, handle, finger and feel.  (R. 339).  In support of these limitations, Dr. Goodman noted that Plaintiff has been diagnosed with osteoarthritis, polyarthritis, fibromyalgia syndrome, and carpal tunnel syndrome, and cited to her July 21, 2010 x-ray showing cervical degenerative disc disease.  (R. 340).

In a second form, Dr. Goodman confirmed that he had been seeing Plaintiff every 3 months since February 5, 2009, and had last examined her on October 24, 2011.  (R. 342).  He reiterated that she has degenerative arthritis in the spine, fibromyalgia syndrome, carpal tunnel syndrome, pain throughout the body, and degenerative disc disease of the cervical spine.  (R. 343).  Though Plaintiff walked normally, (*id.*), Dr. Goodman stated that she has 20% reduced capacity for walking; more than 50% reduced capacity for standing, sitting, stooping, turning, climbing, pushing, and pulling; and an inability to lift more than 10 pounds at a time.  She has full capacity, however, for fine manipulation, gross manipulation, and finger dexterity.  (R. 345).

On July 24, 2012, Plaintiff told Dr. Santiago that the hydrocodone provided some relief for pain along the cervical and lumbosacral spine, but she still complained of numbness in both hands.  (R. 408).  An x-ray of the cervical spine taken that day showed disc space narrowing at C5-C6 and C6-C7, while an x-ray of the lumbar spine showed multilevel lumbar spondylosis and grade 1 spondylolisthesis of L4-L5.  (R. 396).  Plaintiff denied experiencing any anxiety, stress, or depression at the time of the exam, and she exhibited full strength of 5/5 in her arms and legs.  As in the past, she had tenderness to palpation along the cervical and lumber spine, and spinal extension and

rotation "reproduce[d] symptoms" in the lower back and cervical spine. Other testing was negative, however, and Dr. Santiago diagnosed cervicalgia and lower back pain. (R. 409).

The last available record is an August 1, 2012 MRI of the cervical spine. The test showed cervical spondylosis, mainly at C5-C6 and C6-C7, and mild central canal narrowing at C5-C6, but "[n]o significant overall interval change as compared to the prior study" from August 21, 2008. (R. 394).

## B. Administrative Law Judge's Decision

The ALJ found that Plaintiff's degenerative disc disease, spondylolisthesis and stenosis of the lumbar spine, degenerative disc disease of the cervical spine, osteoporosis, mild bilateral carpal tunnel syndrome, fibromyalgia, chronic obstructive pulmonary disease, chronic sinusitis with sinus headaches and surgery in April 2011, panic disorder and dysthymic disorder are all severe impairments, but that they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 13-16). After reviewing Plaintiff's testimony and the medical records, the ALJ determined that she has the capacity to perform light work with the following restrictions: she can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs; never climb ladders, ropes or scaffolds; never work around hazards; occasionally be exposed to concentrated amounts of pulmonary irritants such as dusts, odors, fumes, or gases; frequently use her arms for handling and fingering; and sustain the attention and concentration necessary to perform simple, routine tasks and make simple work-related decisions. (R. 16).

In reaching this conclusion, the ALJ gave little weight to Dr. Goodman's January 23, 2012 opinions of Plaintiff's physical limitations, noting that he "did not even perform an examination on the date he completed his medical source statements." (R. 20). The ALJ also found it inconsistent that Dr. Goodman described Plaintiff as capable of only occasional hand use in one report, but said she had full capacity for hand use in another. (R. 20, 339, 345). In addition, Dr. Goodman "suggests shoulder limitations, but [Plaintiff] exhibited good shoulder range of motion . . . on examinations." (R. 20). The ALJ gave great weight to the opinions from Dr. Baukus, Dr. Anyanwu and Dr. Rohs regarding Plaintiff's physical and mental restrictions. She also gave great weight to Dr. Mehr's mental RFC, except she "found that the claimant has only mild [as opposed to moderate] limitations in her activities of daily living given her work activity." (*Id*.).

With respect to Plaintiff's testimony, the ALJ noted all of her various complaints but found them not fully credible given her conservative treatment for carpal tunnel syndrome, her activities of daily living, her ability to work part-time, and her failure to seek any mental health care aside from receiving medications from her primary care physician. (R. 16-17, 19). Based on all of these findings and the stated RFC, the ALJ accepted the VE's testimony that Plaintiff remains capable of performing her past work as a cashier. (R. 20-21). The ALJ thus concluded that Plaintiff is not disabled within the meaning of the Social Security Act, and is not entitled to benefits.

## DISCUSSION

### A. Standard of Review

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision,

the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B.    Five-Step Inquiry

To recover DIB or SSI under Titles II and XVI of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act. *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008).[6] A person is disabled if she is unable to perform "any substantial gainful activity by reason

---

[6]    The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq.*, and are virtually identical to the SSI regulations set forth at 20 C.F.R. § 416.901 *et seq.*

of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## C.    Analysis

Plaintiff claims that the ALJ's decision must be reversed because she (1) made an improper credibility determination; (2) erred in weighing the opinion evidence of record, resulting in a flawed RFC assessment; and (3) posed an incomplete hypothetical question to the VE.

### 1.    Credibility Determination

Plaintiff argues that the ALJ did not properly evaluate her credibility as required by SSR 96-7p. (Doc. 12, at 6-8). In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence. *See* SSR 96-7p, at *2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about

the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold*, 473 F.3d at 822. *See also* 20 C.F.R. § 404.1529; *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004). Because hearing officers are in the best position to evaluate a witness's credibility, their assessment should be reversed only if "patently wrong." *Castile*, 617 F.3d at 929; *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

Plaintiff testified that though she works part-time as a cashier and has to stand for 4.5 hours a day, 4 days per week, "everything hurts" and she sometimes leans on the register between customers. (R. 33-34). She also complained that her medications give her headaches and make her tired and dizzy, but she denied having any problems at work as a result, and her employer has never raised any complaints about her performance. (R. 34, 38, 48). Plaintiff does not believe she can work full-time because she cannot stand or sit for very long and "[e]very single bone in every part of [her] body hurts so bad." Even the part-time job is difficult for her due to constant pain in her neck, back, hands, arms and legs, and daily headaches. (R. 36-37). She has had injections in her back and neck but never tried physical therapy, and none of her doctors has recommended surgical intervention. (R. 39, 40).

Plaintiff thinks she can lift 10 pounds despite experiencing periodic trembling in her hands along with numbness and aching. (R. 41-42). She estimates that she can sit for 45 minutes and walk up to half a block, and says her daughter has to help her around the house "a lot," including doing the laundry and going grocery shopping. (R. 41-42, 45-46). She is able to button a shirt and tie her shoes, write and type with pain, and grab a doorknob and pick up a coin or paperclip with a little difficulty. (R. 42-43).

Plaintiff spends her days off work sitting on a recliner on a heating pad watching television, and has trouble sleeping such that she has to move around from her bed to a recliner to the couch. (R. 44). One of her doctors gave her wrist braces to wear while she sleeps. (R. 52).

In finding Plaintiff's testimony not fully credible, the ALJ began with the familiar boilerplate credibility language: Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the" stated RFC assessment. (R. 19). The Seventh Circuit has repeatedly criticized this template as "unhelpful" and "meaningless," but ALJs continue to use it in their decisions. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). When they do so, plaintiffs and their counsel often seize on the language as evidence that the credibility finding is backwards and defective. *See also Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (the template "implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards.").

The Court agrees that the "hackneyed language seen universally in ALJ decisions adds nothing" to a credibility analysis. *Shauger*, 675 F.3d at 696. Where, as here, however, the ALJ provides a detailed discussion of the plaintiff's symptoms and testimony, and the reasons she did not find the plaintiff's statements fully credible, the use of the boilerplate template does not alone provide a basis for remand. *See, e.g., Richison v. Astrue*, 462 Fed. Appx. 622, 625 (7th Cir. 2012) (the boilerplate language is

"inadequate, by itself, to support a credibility finding," but decision affirmed where "the ALJ said more."). Plaintiff's argument in that regard is rejected.

Turning to the ALJ's substantive analysis, Plaintiff inaccurately claims that the ALJ played doctor by suggesting that a person with disabling degenerative disc disease, spondylolisthesis and stenosis of the lumbar spine would have received "more treatment, such as surgery." (Doc. 12, at 7). The ALJ merely made the reasonable observation that Plaintiff, whose most invasive treatment for all of her various conditions was limited to epidural steroid injections, has received "conservative treatment and no surgery."[7] (R. 19). *Olsen v. Colvin*, 551 Fed. Appx. 868, 875 (7th Cir. 2014) ("[T]he epidural steroid injections were the most invasive treatment [plaintiff] received for her back pain, and those injections have been characterized as 'conservative treatment.'").

Plaintiff next claims that the ALJ ignored evidence supporting her allegations of disabling pain, namely, Dr. Santiago's July 24, 2012 examination showing that "[e]xtension and right and left lateral rotation of the cervical and lumbosacral spine reproduces symptoms in the lower lumbar paraspinals." (Doc. 12, at 7) (citing R. 409). The ALJ did not mention that specific finding, but she did cite to the same treatment note in discussing Plaintiff's shoulder condition, (R. 20) (citing 17F/17), and acknowledged similar evidence that Plaintiff has limited range of motion and reduced flexion in the spine. (R. 18). Moreover, the ALJ discussed x-rays and MRIs (including the August 2012 MRI Dr. Santiago ordered as part of his examination on July 24, 2012) showing diagnostic support for Plaintiff's pain allegations, including degenerative disc disease, mild central canal narrowing at C5-C6, and narrowing of the neural foramina.

---

[7] The only exception is Plaintiff's sinus surgery, which resolved her sinusitis symptoms. (R. 37).

(R. 17).  On the record presented, the Court is satisfied that the ALJ did not "ignore an entire line of evidence that is contrary to the ruling."  *McDonald v. Astrue*, 858 F. Supp. 2d 927, 938 (N.D. Ill. 2012) (an ALJ "need not discuss every piece of evidence in the record" as long as she does not "ignore an entire line of evidence that is contrary to the ruling.").  *Compare Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014) (ALJ improperly ignored evidence that plaintiff had limited range of motion and difficulty getting on and off the examining table, and mischaracterized x-ray results as being normal when they showed disc space narrowing, transitional vertebra and sclerosis).

Plaintiff argues that the ALJ nonetheless erred in finding that her ability to work 4.5 hours a day 4 days per week translates into her being able to work full-time.  (Doc. 12, at 8).  In fact, the ALJ found that Plaintiff's ability to work part-time as a cashier, "using her hands essentially the whole time," is inconsistent with her testimony that she is precluded from all work due to carpal tunnel syndrome.  (R. 19).  There is nothing improper about this determination, particularly given the mild findings from the November 2011 EMG.  *See Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("Although the diminished number of hours per week indicated that [plaintiff] was not at his best, the fact that he could perform some [part-time] work cuts against his claim that he was totally disabled.").

Plaintiff disagrees, claiming that the ALJ erred in stating that there are no "clinical findings showing that her carpal tunnel syndrome has further impacted her manipulative abilities than has already been accounted for in the [RFC] assessment."  (R. 19).  In Plaintiff's view, there were many such clinical findings, such as a positive Tinel's sign recorded by the rheumatologist Dr. Sunil, a fibromyalgia diagnosis, her use of wrist

braces when sleeping, and her tremors. (Doc. 12, at 8). Once again, Plaintiff has misread the ALJ's decision. It is true that the ALJ did not reference the Tinel's sign in particular, but she did mention the other cited evidence and further discussed Plaintiff's claims of numbness, tingling, swelling, and difficulties making a fist. (R. 16, 17). Based on the mild EMG findings, coupled with Plaintiff's ability to use her hands continuously for part-time work, the ALJ reasonably concluded that those findings failed to support greater functional hand limitations than those set forth in the RFC.

Also unavailing is Plaintiff's suggestion that the ALJ improperly equated her daily activities with an ability to work. The ALJ actually noted that Plaintiff provided conflicting testimony on this issue. For example, Plaintiff stated in an April 2011 Function Report that she had no problem caring for her personal needs, preparing simple meals and grocery shopping, and she likewise told Dr. Baukus in May 2011 that she could independently take care of her personal needs such as toileting, washing and hygiene. (R. 19, 170-72, 311). Yet at the August 2012 hearing, Plaintiff testified that she can only dust shelves and spends all day in a recliner, on the couch or in bed. Of course, Plaintiff also works part-time, which fairly undermines her claim of total disability.[8] *Cf. Thomas v. Colvin*, No. 12 C 4716, 2013 WL 2467644, at *1 (N.D. Ill. June 7, 2013), *rev'd*, 745 F.3d 802 (7th Cir. 2014) (plaintiff was fired from her job and ceased all work activity three years before she applied for benefits). The ALJ properly considered Plaintiff's activities of daily living in assessing her credibility in this case. *Roddy v.*

---

[8]     Plaintiff testified that she lives with her employed husband and makes no claim here that she continued working as a cashier due to financial hardship. Nor does she assert that her employer, who was at all times satisfied with her performance, made allowances to accommodate her conditions.

*Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) ("[I]t is appropriate for an ALJ to consider a claimant's daily activities when evaluating their credibility.").

With respect to her mental impairment, Plaintiff claims the ALJ improperly observed that she "has not had any mental health treatment other than receiving medications from her primary care physician who has noted only minimal findings." (R. 19). The Court sees no error here since Plaintiff did not in fact seek any mental health treatment, which is a valid basis for doubting her claim of a disabling mental impairment. *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (fact that plaintiff "never saw a mental health care specialist about her depression . . . provides support for the ALJ's credibility finding."). While essentially conceding this point, Plaintiff faults the ALJ for ignoring more significant findings in reports from Dr. Baukus and Dr. Mehr. (Doc. 12, at 9-10). Specifically, Dr. Baukus stated in May 2011 that Plaintiff had a constricted affect and depressed mood, with psychomotor agitation in the form of hand-wringing and imperfect judgment. (R. 311-12). And in June 2011 Dr. Mehr found Plaintiff moderately limited in her activities of daily living and her in her ability to maintain concentration, persistence or pace. (R. 324).

The flaw in Plaintiff's argument is that the ALJ discussed both of the cited reports, affirmatively noting findings of constricted affect, depressed mood, fair relatedness, and moderate difficulties with activities of daily living and concentration, persistence or pace. (R. 18-19). In addition, the ALJ incorporated Dr. Mehr's opinion into the RFC assessment, agreeing that she only has "the cognitive capacity to understand and remember instructions for simple work of a routine and repetitive

nature." (R. 16, 330). Contrary to Plaintiff's assertion, the ALJ in no way presented "an impermissibly skewed view of th[is] evidence." (Doc. 12, at 10).

Plaintiff finally objects that the ALJ failed to explain why she is capable of concentrating in a full-time job given that her medications cause side effects including nervousness, anxiety, fatigue, dizziness and drowsiness. (Doc. 12, at 9). Plaintiff finds this significant because she claims that the side effects prevent her from concentrating 50% of the time, and the VE testified that an employee cannot work if she is off task more than 20% of the time. (R. 17, 56). It is clear from the ALJ's decision that she was aware of the claimed medication side effects, (R. 17, 19), but she did not articulate whether or to what extent she credited Plaintiff's testimony in that regard. This omission may not be sufficient, standing alone, to reverse the decision in light of the numerous other reasons the ALJ provided for finding Plaintiff not fully credible. *See Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013) ("[T]he standard of review employed for credibility determinations is extremely deferential," and an ALJ need only "provide some evidence supporting her determination."). Given that the case must be remanded for another reason discussed below, however, the ALJ should also revisit this issue and clarify how any medication side effects factored into the credibility determination.

### 2. RFC Determination

Plaintiff next argues that the ALJ improperly rejected the January 2012 opinions from Dr. Goodman, resulting in a flawed RFC determination. (Doc. 12, at 12). A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. §

404.1527(c)(2); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). An ALJ must offer "good reasons" for discounting a treating physician's opinion, Scott, 647 F.3d at 739, and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the attention of the ALJ. 20 C.F.R. § 404.1527(c)(2)-(5). *See, e.g., Simila*, 573 F.3d at 515.

Dr. Goodman opined that Plaintiff can lift no more than 10 pounds; sit, stand and walk for less than 2 hours in an 8-hour workday; occasionally climb ramps or stairs; occasionally push, pull, balance, kneel, stoop, crouch, crawl and reach overhead; never climb ladders, ropes or scaffolds; and occasionally handle, finger and feel. (R. 339). In giving this opinion little weight, the ALJ first noted inconsistencies in Dr. Goodman's description of Plaintiff's hand functioning. (R. 20). Specifically, after limiting Plaintiff to only occasional handling, fingering and feeling in one report, (R. 339), he then stated that she has full capacity for fine manipulation, gross manipulation and finger dexterity in another report. (R. 345). This is a valid reason for rejecting the hand restrictions identified by Dr. Goodman.

The ALJ's two additional reasons for rejecting Dr. Goodman's opinion are less compelling. First, the ALJ found it significant that Dr. Goodman "did not even perform an examination on the date he completed his medical source statements." (R. 20). As Plaintiff notes, however, Dr. Goodman examined Plaintiff just three months earlier on

October 24, 2011, and had seen her regularly throughout 2009, 2010 and 2011. (R. 247-56, 258-59, 373-76, 378). Defendant does not provide any response to this issue, and the Court cannot accept it as a sufficient basis for giving the doctor's entire opinion little weight.

That leaves the ALJ's observation that "Dr. Goodman suggests shoulder limitations, but [Plaintiff] exhibited good shoulder range of motion and normal gait on examinations." (R. 20) (citing Exs. 9F; 17F/17). The cited exhibits are Dr. Sunil's November 2011 rheumatology exam, (R. 338), and Dr. Santiago's July 2012 orthopedic exam. (R. 408). The problem is that Dr. Sunil diagnosed Plaintiff with fibromyalgia, which can cause limitations even without poor range of motion or gait problems. *See, e.g., Thomas*, 745 F.3d at 806 (fibromyalgia diagnosis constituted sufficient medical evidence of "shoulder problems that would limit [the plaintiff's] ability to reach overhead."); *Meade v. Colvin*, No. 3:12-CV-245, 2013 WL 5498263, at *11 (N.D. Ind. Sept. 30, 2013) (ALJ's "repeated references to the fact that [the plaintiff] had full range of motion in all joints and that her joints were not swollen" was "troubling" because "swelling of the joints is not a symptom of fibromyalgia.").

The only doctors who found Plaintiff able to perform the standing, walking and lifting requirements for light work are Dr. Rohs and Dr. Anyanwu, both of whom evaluated Plaintiff in May 2011, prior to her fibromyalgia diagnosis in November 2011. To be sure, Dr. Goodman's standing restrictions are contradicted in part by Plaintiff's ongoing work as a cashier, which requires her to stand for 4.5 hours (not 2 hours) 4 days per week. But the ALJ did not cite that as a basis for rejecting Dr. Goodman's opinion. *Folino v. Astrue*, No. 11 C 3556, 2013 WL 535524, at *6 (N.D. Ill. Feb. 11,

2013) (quoting *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011)) ("'[W]hat matters are the reasons articulated *by the ALJ*.'"). Though the ALJ acknowledged the fibromyalgia diagnosis and found it to be a severe impairment, she failed to adequately explain how it factored into her RFC determination or her decision to reject Dr. Goodman's opinion that Plaintiff is incapable of performing light work. The case must be remanded for further assessment of this issue.

The Court does not find a similar error with respect to Plaintiff's mental impairment. Plaintiff's only argument in that regard is that the ALJ failed to explain why she rejected Dr. Mehr's opinion that Plaintiff has moderate limitations in her activities of daily living, and instead found her to have only mild limitations in that area. (Doc. 12, at 13-14). In fact, the ALJ clearly tied this decision to Plaintiff's "work activity" which, as noted, requires that she run a cash register 4.5 hours per day, 4 days per week. (R. 20, 33). Moreover, Dr. Mehr and Dr. Baukus both opined that Plaintiff is independent in her activities of daily living. According to Dr. Mehr, Plaintiff is "typically independent in activities of daily living to the extent allowed by her physical condition." (R. 330). Dr. Baukus likewise noted that Plaintiff "independently takes care of her activities of daily living such as toileting, washing, and personal hygiene needs." (R. 14, 311). She also gets around the neighborhood by walking and driving, does some light chores, and sometimes goes to the grocery story with her daughter. (R. 14-15, 311). On the record presented, the ALJ fairly explained why she found Plaintiff to have only mild mental limitation in her activities of daily living.

### 3.     Hypothetical Question

Plaintiff's last argument for remand concerns her moderate limitation in concentration, persistence or pace. She first claims, inaccurately, that the ALJ omitted that limitation from the hypothetical questions posed to the VE. (Doc. 12, at 14). The record shows that the ALJ asked the VE about an individual who could "sustain the attention and concentration to perform simple, routine tasks and make simple, work-related decisions." (R. 54). This language is taken directly from the mental RFC assessment completed by Dr. Mehr, who translated his findings concerning Plaintiff's moderate limitations in concentration, persistence or pace into a specific RFC assessment. (R. 324, 330). The Seventh Circuit has made clear that an ALJ may reasonably rely on such a medical opinion in determining a claimant's RFC and in formulating a hypothetical question for the VE. *Milliken v. Astrue*, 397 Fed. Appx. 218, 221-22 (7th Cir. 2010); *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002).

Plaintiff also cites *Punzio v. Astrue*, 630 F.3d 704 (7th Cir. 2011), for the proposition that "[o]ur Court of Appeals has accepted a definition of a moderate limitation in concentration, persistence and pace as 20 to 30 percent off task." (Doc. 12, at 14). She then notes the VE's testimony that a person cannot work if she is off task more than 20 percent of the time. (R. 56). Contrary to Plaintiff's suggestion, the *Punzio* court did not find that anyone with a moderate limitation in concentration, persistence or pace will be off task 20 percent of the time. In that case, the plaintiff suffered from mental illness for most of her adult life, and at a hearing before the ALJ her attorney defined the term "moderate restriction" to mean "an inability to perform the skill in question between 20 percent and 30 percent of the time." *Punzio*, 630 F.3d at 705,

708. The Seventh Circuit said that based on that definition, a treating physician's statement in a treatment note that the plaintiff had moderate limitations was not inconsistent with his subsequent opinion that she was "seriously limited, but not precluded" from engaging in unskilled work, meaning her performance would be "less than satisfactory." *Id*. at 711.

Here, no one suggested that moderate limitations in concentration, persistence or pace should be construed as a person being off task more than 20 percent of the time. Moreover, Plaintiff fails to identify any physician who stated that she would in fact be off task that amount of time. The Court thus finds no error in the ALJ's hypothetical question to the VE. That said, if on remand the ALJ alters the RFC determination in light of Plaintiff's fibromyalgia diagnosis or medication side effects, then she may need to consult a VE and pose an appropriately revised question regarding her ability to work.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 11) is granted, and Defendant's Motion for Summary Judgment (Doc. 16) is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated: March 9, 2015

SHEILA FINNEGAN
United States Magistrate Judge

28